# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14 CR 345 ERW / DDN |
| | ) | |
| CASEY PEEBLES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER AND RECOMMENDATION

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Before the court are the motions (1) of the United States for a determination of the admissibility of arguably suppressible evidence (Doc. 46, oral), and (2) of defendant Casey Peebles (a) to suppress evidence generally (Doc. 57, oral), (b) to suppress physical evidence (Doc. 207), (c) to sever counts and defendants (Doc. 208), (d) to suppress identification evidence, and (e) in limine (Doc. 257) to admit evidence that would impeach three government witnesses, either in their testimony during the pretrial evidentiary hearing or at trial. A pretrial evidentiary hearing was held on these motions on June 24, June 25, and July 2, 2015.

## Motion in limine regarding impeachment information

The in limine motion of defendant Peebles seeks an order of the court allowing defense counsel to cross examine two government witnesses, who are now and were police officers during the investigation that led to the instant indictment. Defendant alleges that these officers were administratively disciplined because they arrested persons who illegally sold 2006 World Series tickets for more than their face value. Instead of securing in the proper fashion the tickets which were seized, defendant argues the officers

allowed family members and friends to use the tickets to attend the World Series. Defense counsel would ask the witnesses about this disciplinary matter under Federal Rule of Evidence 608(b), because it is probative of the officers' character for truthfulness or untruthfulness, citing United States v. Staples, 410 F.3d 484, 489 (8th Cir. 2005) (ruling that fraudulent conduct implicates a witness's character for truthfulness). Defendant also argues that this line of cross-examination is not excluded under Federal Rule of Evidence 403, because its probative value outweighs any danger of unfair prejudice, confusion of the issues, misleading the factfinder, and the other harms the rule is intended to protect against.

The undersigned has carefully considered this matter and has determined that such impeachment by defense counsel would be improper. First, the probative value of any such testimony is virtually negligible. Almost nine years have passed since the incident and any disciplinary action which gave rise to the motion. There is no suggestion that the subject officers were engaged in a systemic, repeated series of improper activities that could reflect improperly on their credibility. Further, such evidence could easily unfairly prejudice the witnesses in front of the jury, confuse the issues of the case, and mislead jurors, if the facts are as defendant alleges. Even if this information might be admissible, which the undersigned does not conclude, the testimony of the subject officers was strongly corroborated by witnesses unrelated to the 2006 World Series matter, and who included defendant's own hearing witness. United States v. Beck, 557 F.3d 619, 621 (8th Cir. 2009).

For these reasons, the in limine motion to allow the suggested cross-examination is denied.

## Motions to suppress evidence

From the evidence adduced during the evidentiary suppression hearing, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1. From and including 2011 through 2014, St. Louis Metropolitan Police Detective Mark Biondolino,[1] a Drug Enforcement Administration (DEA) Drug Task Force Officer, investigated the Thomas Rander Drug Trafficking Organization (Rander DTO). In late 2012 he became the Lead Case Agent for that investigation. From his sources of information, Det. Biondolino learned that the Rander DTO was based in Compton, California. Also under investigation were Thomas Rander's brother, Joseph Rander, Michael Shorty, and Benjamin Lowe. Sources also told Biondolino that the Rander DTO used individuals to transport many kilos of heroin and cocaine from California to St. Louis. These couriers used cars, buses, planes, trains, and other forms of transportation for the drugs. These methods were also used to transport the proceeds of the drug sales back to California. This drug trafficking organization understood that some of this money would be intercepted and seized by law enforcement.

---

[1] Det. Biondolino has been a certified law enforcement officer since September 1995. He has been involved in drug investigations for more than 19 years. He has been a DEA Task Force Officer for over 7 years. His experience includes investigation of complex drug trafficking organizations. In a motion in limine, Doc. 257, defendant Peebles attacks the credibility of Det. Biondolino in this hearing, because in 2006, Biondolino and Officer Joseph Somogye, who also testified during this pretrial suppression hearing, assertedly were disciplined for allegedly using 2006 St. Louis Cardinals World Series tickets that had been seized by the St. Louis Metropolitan Police Department as evidence of a crime. For the reasons set forth above in this Report and Recommendation, the undersigned finds the testimony of Det. Biondolino credible.

2.      On September 29, 2011, a rental van was stopped by the police on Interstate 70 in St. Charles County. The van was driven by Benjamin Lowe; Thomas Rander, who had rented the van, was a passenger. The officer who stopped the van told Biondolino that the driver's license had been suspended. In the stop, Thomas Rander told the officer he could search the van. The officer radioed for police assistance. After all the occupants, including Bobby Rander, were removed from the van, a narcotics trained dog sniffed the vehicle for the presence of controlled substances. The dog alerted to the rear of the van where Rander and Shorty previously sat. Shorty was searched and in both of his socks the police found and seized packages of cocaine. Bobby Rander was searched and packages of cocaine were found in his socks. Then both Bobby Rander and Michael Shorty were advised of their constitutional rights to remain silent and to counsel. Thereafter, Bobby Rander and Michael Shorty made statements to the police about the San Bernardino, California source of the drugs. Bobby Rander told the police that he had been told the carry the drugs to St. Louis.

3.      On October 31, 2011, a cooperating individual (CI) was fitted out by law enforcement with a recording device to do a controlled buy of drugs from Michael Shorty. The operation was not successful on that day because Shorty was not home.

4.      On a second attempt to conduct a controlled buy from the Rander DTO, the CI contacted Benjamin Lowe at a location in the 5400 block of Bermuda. The CI had been given $1,000.00 to buy drugs from Lowe. After giving the money to Lowe so he could count it, the CI was told to leave and return. The CI did so and was told to get the drugs from a downspout on the building. There the CI found 22 grams of crack cocaine.

5.      On November 2, 2011, a controlled purchase of drugs occurred at 5911A Highland in St. Louis. On this occasion, the CI was fitted with recording equipment and given $1,000.00 to buy 1 ounce of crack cocaine. In the first attempt, the CI was unsuccessful in accomplishing the buy. The second attempt to make a controlled buy was successful. The second attempt was successful and the CI turned over to the officers 13 grams of crack cocaine purchased from Shorty and Joseph Rander.

6. On November 9, 2011, DEA agents and investigators contacted Melissa Waters in Albuquerque, New Mexico. Law enforcement had determined that Waters was Michael Shorty's girlfriend and that she had previously purchased an AMTRAK ticket. Law enforcement officers contacted her and found $700 in cash in her purse and more money in her bra. She told the officers that she was traveling to St. Louis to live with Lisa Rander, whose contact information she gave the officers.

7. On August 27, 2012, law enforcement officers, including female DEA agent Small encountered Lisa James in Albuquerque. Agent Small asked Ms. James if she could search her luggage. In response, Lisa James pushed her bag to Agent Small. In this encounter, Agent Small saw that Ms. James was wearing clothing that was uncomfortable during the August heat there. Agent Small searched James's person and seized 2 kilograms of narcotics, which had been taped to her body. After being advised of her constitutional rights to remain silent and to counsel, Ms. James told the officer that she was transporting drugs from the San Bernardino, California residence of her uncle, Thomas Rander. James said she was to meet in St. Louis with Michael Shorty and Thomas Rander. Ms. James also said that between June and July that year she had made 4 such trips for Thomas Rander. On one of these 4 trips, on August 7, 2012, she was stopped and $60,000.00 was seized from her.

8. During March 2013 Det. Biondolino used Quantiae Harris[2] as a cooperating source. Thereafter, Harris told the investigators that the Randers, including Joseph

---

[2] Quantiae Harris, a co-defendant in this case, testified on behalf of the United States during this pretrial evidentiary suppression hearing. Harris testified that he hoped his testimony would garner leniency in the disposition of his charges. He also testified that the government had paid for his lunch one day due to a delay in the hearing. His hearing testimony corroborated Det. Biondolino's. In the rendering of these findings of fact, the undersigned has not distinguished between those facts testified to by Det. Biondolino and those testified to by Harris; their testimonies did not conflict in any substantial way. Det. Biondolino and Quantiae Harris were credible witnesses.

Rander, and Michael Shorty, sold drugs from 5911A Highland in the City of St. Louis.[3] Harris had been employed for over ten years by the Randers in a security capacity in California and in St. Louis. He was the organization's "doorkeeper." His job in St. Louis was to stand outside the first floor front door of 5911A Highland and allow inside only people who had arranged with Joseph Rander to conduct drug business with him. Because the drug trafficking occurring in 5911A involved substantial drugs and money, the traffickers were concerned that someone might try to rob them. As the doorkeeper, Quantiae Harris knew that a firearm was available to him in the upstairs apartment.

9. In late March 2013, Harris told Dets. Biondolino and Cisco that Thomas Rander had come to St. Louis to deliver narcotics and to return to Los Angeles with the cash drug sales proceeds. Harris told them these activities would occur at 7521 Roland, the St. Louis County residence of Kay Black. Harris's information included a description of the motor vehicle used by Thomas Rander, a black GMC van. Harris told the officers that there was more currency to be transported than would be handled by one motor vehicle. So, a Dodge Caravan was also to be used. He also told the officers that there was a kilogram of heroin then in the residence. Harris said he had seen $180,000 in stacks of $5,000 each being prepared for couriers to take back to California in their shoes. Harris also said that 4 females were preparing to fly from St. Louis with money.

10. On March 28, 2013, to verify Harris's information, Det. Biondolino and other officers drove past 7521 Roland and saw a rental van parked there. They learned that the van had been rented in San Bernardino by Lisa Rander, Thomas Rander's wife. On another occasion, officers saw another van there that had been registered to Virgil Black, also a Rander relative. That van was followed into the downtown St. Louis area to a casino where drug sales proceeds were to be laundered into $1,000 bills. This was the money to be carried in the couriers' shoes.

---

[3] 5911 Highland is a four-family, two story, brick residence. 5911A is one of the upstairs apartments. Access to 5911A is through a first floor front door on the right as the building is faced from the street. (Gov. Ex. M1.)

11. In the early hours of March 29, 2013, both the Dodge Caravan and the black GMC van were stopped by police in the St. Charles area. D'Aquarius Blackwell, the son of Thomas Rander, was driving the Dodge Caravan; this vehicle was stopped and searched. In his shoes officers found $54,610 in currency. In the GMC van, the driver, Thomas Rander, was searched and from his shoes were seized $25,060.00. Rander told the officers that his son was to follow him back to California. Corey Black, a passenger in one of the vans, was searched and $19,000.00 was seized from him. Because the information provided by Quantiae Harris led to these substantial seizures of drug sales proceeds, Det. Biondolino considered Harris a reliable informant.

12. During the evening of April 2, 2013, Harris went to 5911A Highland and saw Joseph Rander. Rander was very excited because a substantial drug transaction was being developed. He told Harris that "Twin's people" were going to come there to buy heroin. Rander excitedly told Harris about the pending sale, "We're going to get it back together." Rander told Harris to go work the door, i.e. be the doorkeeper for the transaction. Although he did not know how much heroin Rander was going to distribute, Harris phoned Det. Biondolino and told him what he knew.

13. Because the transaction could involve as much as a kilogram of heroin, Det. Biondolino called in other narcotics officers, including DEA Task Force Officer Joseph Somogye[4] and Det. Cisco. They were to arrive in the area of 5911 Highland in an undercover capacity to watch what transpired and be available if needed. Officer Somogye drove there in an unmarked pickup truck, wearing plain clothes without any police logo. After receiving Biondolino's call, Det. Cisco phoned narcotics detective

---

[4] Defendant Peebles seeks to discredit Officer Somogye's testimony, because he along with Det. Biondolino is argued to have misused evidence of the illegal sales of World Series tickets in 2006. For the reasons set forth above in this Order and Recommendation, the undersigned finds the testimony of Officer Somogye credible.

Blake Witzman[5] and directed him to go to join the police team in the area of 5911 Highland. Det. Witzman immediately left his home and joined Cisco in a pickup truck. Witzman wore civilian clothes and a ballistics vest with a police logo on it.

14. Shortly before midnight, a dark colored Land Rover arrived at 5911 Highland. From their stations, Dets. Somogye and Witzman saw the driver of the Land Rover exit the vehicle and walk up to the front door of upstairs apartment 5911A Highland. From inside the upstairs apartment, Harris also saw the Land Rover arrive outside and park. He then walked downstairs to open the front door for the purchaser. The front of 5911 was well lit and Harris clearly saw the Land Rover driver got out of the vehicle, walk toward the building, walk up to the front door where Harris was stationed, enter the front door past Harris, and go upstairs to the 5911A apartment. Harris also contacted the officers and let them know what was happening. Harris shut the front door, went upstairs, and walked into the kitchen where the driver met with Joseph Rander. While the light in the kitchen was dim, there was sufficient light for Harris to see who was there; he heard what was said and saw what was going on. Rander and the driver talked in both the kitchen and in the living room which was lighted. Harris saw Rander hand the driver an unknown amount of drugs. Harris saw the driver put the drugs in the sleeve of his jacket. Then the driver left the apartment, just ten minutes after he had driven up and parked. Harris let the driver out the front door, saw the driver re-enter the driver's door of the Land Rover and drive it away. Harris phoned Det. Biondolino and told him what had just happened.

15. Outside, Det. Somogye saw the driver leave the apartment, get into the Land Rover and drive away. The Land Rover went to the end of Highland and turned right onto Hodiamont. Det. Witzman saw the Land Rover fail to come to a complete stop

---

[5] In a motion in limine, defendant Casey Peebles argues that the evidentiary testimony of Det. Witzman should be impeached by the fact that in 2011, as stipulated by the government, Det. Witzman was disciplined for transmitting a photograph of someone who had been shot by a police officer.

at the stop sign at the intersection of Highland and Hodiamont. (Gov. Ex. 3.) Very soon thereafter, the police stopped the Land Rover at 2616 Hodiamont, just before it reached an alley that intersected Hodiamont just north of Highland. The police did not conduct the stop as a normal traffic stop; the officers did not ask the driver for his driver's license, registration, or insurance proof, and no traffic ticket or warning was issued.

16. After the Land Rover stopped, Det. Witzman got out of his vehicle and walked up to the Land Rover. The driver was defendant Casey Peebles[6]; the front seat passenger was identified as Bruce Woods (later truly identified as Vernon Wescott), and female passenger Leah Douglas was in the back seat.[7] As he approached the Land Rover Det. Witzman looked through a back window and saw the female passenger drop her shoulders and appear to put something between her legs. He was concerned she was either hiding something or was placing a weapon there. Witzman He immediately told the other officers that she was placing something between her legs. Witzman opened her door and ordered her to show her hands. She did so and got out of the vehicle. Because

---

[6] Det. Witzman identified defendant Casey Peebles in the courtroom during the suppression hearing as the driver of the Land Rover.

[7] At the evidentiary hearing, co-defendant Leah Douglas testified for defendant Peebles. Her hearing testimony occurred after she had pled guilty in this case and her defense attorney was present in the courtroom. She testified that defendant Peebles was the driver of the Land Rover. Aside from her testimony that Peebles had made a complete stop at the intersection of Highland and Hodiamont, in all other relevant respects, her testimony corroborated that of the government's witnesses. She testified that, after Peebles stopped the Land Rover, the front seat male passenger handed back to her a white brick of material. She then bent over and placed the package inside her pants. Once she was outside the vehicle, a male officer searched her jacket and found nothing. The male officer did not conduct a pat down search of her. Rather, she testified she was patted down by a female officer who arrived about 20 minutes after the Land Rover was stopped. The female officer found the white brick in her clothing, handcuffed her, and placed her in a police vehicle. Douglas also testified that she is cooperating with the government and is hopeful of receiving leniency. The undersigned considers her testimony credible.

she is a female, Det. Witzman called for a female officer to be dispatched to the scene. Det. Erin Beckerer, then Erin Lasinski, arrived about 12 minutes later. Det. Lasinski searched Leah Douglas and found a baggie containing a quantity of material believed to be heroin on Douglas's person. Lasinski told Dets. Cisco and Biondolino what she found.

17. Det. Somogye arrived at the scene of the stop shortly after the Land Rover was stopped, after the driver had gotten out of the Land Rover, and while its other occupants were getting out. Somogye immediately identified the driver of the Land Rover as the person he saw go into and come out of 5911A Highland.[8]

18. The driver of the Land Rover, defendant Casey Peebles, was placed under arrest and taken to the Drug Enforcement Administration office in St. Louis. There he, Douglas, and Wescott were booked and processed. There Peebles was advised of his constitutional rights to remain silent and to counsel. Peebles made no statement to the officers.

19. After the Land Rover drove away from 5911 Highland, Quantiae Harris went back upstairs to 5911A. There Rander told him that the driver bought 9 ounces of heroin. Rander also told Harris that he had fronted the heroin to the driver and had not required the buyer to pay for it right then. Throughout this transaction in 5911A Highland, Harris carefully observed all that went on, because his job was to protect the drug trafficking operation from being robbed by a putative buyer. There had been no obstruction that prevented Harris from seeing the whole of the transaction, including the buyer of the drugs.

20. On March 12, 2015, Quantiae Harris made a proffer of information in the office of the United States Attorney. Present were the federal prosecutor and Harris's defense attorney. In that proceeding, Det. Somogye, in the presence of Det. Lasinski,

---

[8] During the pretrial suppression hearing, Det. Somogye identified defendant Casey Peebles in the courtroom as the driver of the Land Rover and as the person who went into and came out of 5911A Highland.

showed Harris a Missouri driver's license photo. Somogye asked Harris whether or not he knew who the subject was. Harris he did not know this person's name, but immediately stated with complete certainty that this was the person whom he saw get out of the Land Rover, walk past him through the front door of 5911A Highland and this was the person who bought the 9 ounces of heroin from Joseph Rander.[9] No one suggested to Harris who the subject in the photo was or suggested this information to him.

## **DISCUSSION**

By his motions to suppress, defendant seeks to suppress the physical evidence seized from Leah Douglas following the stop of the Land Rover on April 3, 2013. He argues that the stopping of the Land Rover was illegal and, therefore, the events that followed, including the search of Leah Douglas and the seizure of the large amount of heroin from her were unconstitutional. The undersigned disagrees.

When the officers stopped the Land Rover after it turned from Highland onto Hodiamont, they had probable cause to believe that the Land Rover contained the heroin that Peebles had just purchased from Joseph Rander at 5911A Highland. Illinois v. Gates, 462 U.S. 213, 238 (1983) (defining probable cause as "a fair probability that contraband or evidence of a crime will be found in a particular place.") The officers had a wealth of prior incidents in which Quantiae Harris provided them with true information about drug trafficking. Thus, his statements to the officers about what he personally believed was going to happen and what he personally, actually saw happen inside 5911A Highland were very reliable and provided probable cause for the officers to act lawfully without a warrant under the Fourth Amendment. Id.; Draper v. United States, 358 U.S. 307, 313 (1959). Further, the information known to the officers provided them with probable cause under the Fourth Amendment to believe that the driver of the Land Rover,

---

[9] During the evidentiary hearing, Quantiae Harris identified defendant Casey Peebles in the courtroom as the person who drove the Land Rover during the heroin purchase at 5911A Highland the evening of April 2-3, 2013.

defendant Casey Peebles, had just committed a serious criminal offense by purchasing a quantity of heroin and was then committing a serious offense by either actually possessing this heroin or acting to transport the heroin.  Beck v. Ohio, 379 U.S. 89, 91 (1964) (ruling that probable cause to arrest without a warrant includes information sufficient to cause a reasonable person to believe that the subject had committed or was then committing an offense).

The motion to suppress the physical evidence seized from Leah Douglas should be denied.

Defendant also seeks to suppress as evidence against him the single photo identification of him by Quantiae Harris and the in-court identifications of him by the government witnesses.  These identifications should not be suppressed.

On March 12, 2015, Quantiae Harris identified the subject photograph as that of the person who drove the Land Rover and who bought the heroin from Joseph Rander. Defendant argues that this identification procedure violated his rights to due process under the Constitution.  In that regard he must prove that the identification procedure was impermissibly suggestive and could result in an irreparably suggestive identification. Stovall v. Denno, 388 U.S. 293, 302 (1967).

Defendant argues that use of a single photograph of defendant was unnecessarily suggestive.  The facts on this question make a close case.  A single photograph was shown to Harris, but he was not asked if he recognized the subject in a case where there was one perpetrator.  Rather, there were many people involved in the Rander DTO and Harris was not given any context which indicated what, if anything, the subject of the photograph was believed to have done.  Yet Harris with certainty stated that this person, whatever his name, was the person who drove the Land Rover and bought the heroin. Certainly, an array of several photos used with the same question to Harris would have made the procedure less suggestive.  But the question in the context of a single photo display gave Harris the potential of not knowing anything about the person or stating one or more of many things Harris knew about the person depicted.  Yet, Harris immediately

said this person drove the Land Rover and bought the heroin. No fact in the circumstances of the identification or of the case indicated these two facts, other than a reliable recollection by Harris.

Nevertheless, even assuming the single photo procedure was impermissibly suggestive, which the undersigned does not find, this identification withstands constitutional scrutiny, because the totality of the circumstances indicates that the identification is reliable. <u>Neil v. Biggers</u>, 409 U.S. 188, 198 (1972); <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114-16 (1977). The factors set out in <u>Biggers</u> are relevant. <u>Biggers</u>, 409 U.S. at 199-200. First, Harris had a substantial opportunity to view Peebles when he watched the Land Rover drive up to and park in front of 5911A Highland; he watched the driver get out, walk up to the entry door, where Harris was stationed as the doorkeeper; Harris went upstairs and saw Peebles converse with Rander and take the drugs and secrete them in his clothing; Harris then saw Peebles leave the premises and get into the Land Rover and drive it away. Second, Harris paid a high degree of attention to Peebles and what was going on, because Harris's job included preventing this person from possibly robbing the Rander DTO. Next, Harris's level of certainty about his identification of what the person in the photo did was very high. Finally, the two years that passed from the activities of April 2-3, 2013 to the identification in March 2015 are not such a long time to render Harris's memory weak without more. In the totality of the relevant circumstances, Harris's March 2015 identification of Peebles as the driver of the Land Rover and as the buyer of the heroin was reliable. And the corroborating identifications of Peebles as the driver and buyer by the law enforcement officers who were on surveillance outside 5911A on April 2-3, 2013, and by at least one of the occupants of the Land Rover, Leah Douglas, while not determinative certainly lend credence to Harris's identification. <u>Manson</u>, 432 U.S. at 116.

The motion to suppress Harris's photo identification should be denied.

Defendant also seeks to suppress the in-court identifications of him as the driver of the Land Rover by Dets. Witzman and Somogye. The undersigned agrees that the in-

court identification of defendant, the sole defendant seated at counsel table in custody, is a very suggestive procedure. However, given the opportunities these officers had to view Peebles on the scene of the stop of the Land Rover, given the fact that these officers are trained law enforcement investigators, and given their level of certainty that Peebles was the Land Rover driver, the in-court identifications of defendant were reliable.

Quantiae Harris and Leah Douglas also identified defendant in the courtroom as the driver of the Land Rover and the one who bought the heroin. For the reasons given above regarding his photo identification, Harris's in-court identification of Peebles is reliable. And Douglas's involvement with Peebles in the Land Rover after he returned with the package of heroin was very substantial and made her courtroom identification of him reliable.

The motion to suppress the in-court identifications by Dets. Somogye and Witzman, and by Quantiae Harris and Leah Douglas should be denied.

## **ORDER AND RECOMMENDATION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motion of defendant Casey Peebles to sever counts and defendants (Doc. 208) is denied as moot. At the beginning of the pretrial hearing, on May 20, 2015, defendant agreed that this motion is no longer viable, because co-defendant Leah Douglas has pled guilty in this case. She will not be tried with him.

**IT IS FURTHER ORDERED** that the motion of the United States for a determination by the court of the admissibility or not of any arguably suppressible evidence (Doc. 46) is denied as moot by the rendering of this Order and Recommendation.

**IT IS FURTHER ORDERED** that the motion of defendant Casey Peebles in limine regarding the cross-examination of the police officers (Doc. 257) is denied.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Casey Peebles

Peebles (a) to suppress evidence generally (Doc. 57, oral), (b) to suppress physical evidence (Doc. 207), and (c) to suppress identification evidence (Doc. 248) be denied.

The parties have until not later than August 24, 2015 to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 6, 2015.